**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 21 2015, 6:45 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CARA SCHAEFER WIENEKE**
Wieneke Law Office, LLC
Plainfield, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CHRISTINA D. PACE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BENJAMIN T. HAINES, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 90A02-1408-CR-545 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

**APPEAL FROM THE WELLS SUPERIOR COURT**
The Honorable Everett E. Goshorn, Judge
Cause No. 90D01-1303-FD-36

**January 21, 2015**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Benjamin T. Haines appeals his convictions for resisting law enforcement, as a Class D felony; reckless driving, as a Class B misdemeanor; and criminal mischief, as a Class B misdemeanor, following a jury trial. Haines presents three issues for our review, which we revise and consolidate into one issue, namely, whether the trial court committed fundamental error when it admitted certain evidence at trial.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On the night of March 17, 2013, Deputy Russell Mounsey of the Wells County Sheriff's Department parked his squad car at a church on State Road 218 to patrol for traffic violations. At approximately 10:00 p.m., Mounsey's radar clocked a vehicle traveling east on State Road 218 at ninety-three miles per hour in a fifty-five mile-per-hour zone. Mounsey could not identify the make and model of the vehicle when it passed him, but, when he began his pursuit, he noticed that it had distinctive taillights that "made [him] think of the newer Camaros or the newer Dodge Challengers." Tr. at 24. Mounsey activated the lights and siren on his car during the pursuit.

Despite Mounsey reaching speeds of approximately one-hundred miles per hour, the speeding vehicle expanded its distance from Mounsey, and Mounsey lost track of the vehicle on East County Road 1000 South between the intersections of South County Road 250 East and State Road 1, which are "about a mile and a quarter" apart. Id. at 29. Around that time, however, Judith Herring observed a red vehicle rapidly approaching her home, which is located on State Road 1 about a quarter of a mile away from where

2

Mounsey lost track of the vehicle. Herring believed that the vehicle was headed for her driveway, or through her yard, so she went to her window to look. When she did, she could no longer see the vehicle.

Also around this time on March 17, Jacob Sonnetag, a longtime friend of Haines, received a late-night phone call from Haines, in which Haines explained to Sonnetag that "he was coming home from Indianapolis[,] . . . was going kind of fast[,] . . . lost control of the vehicle and went into a field[,] and needed some help." Id. at 81. Haines told Sonnetag that he was walking on State Road 1 and asked Sonnetag to pick him up. Sonnetag agreed and picked Haines up on State Road 1. Sonnetag took Haines to Jeffrey Moore's apartment, and, while doing so, Haines explained to Sonnetag

> that[,] basically[,] because he didn't need another speeding ticket because[,] if he got another speeding ticket[,] he would lose his license—that he had fled from the police. In doing so[,] his vehicle lost control[,] and it was in a field.

Tr. at 83. Haines stated that he had been driving a 2013 Camaro SS ("Camaro").

Moore was asleep when Haines arrived at his apartment. Haines woke Moore and told him "that the car was stuck and he just needed help. [Haines] acted like somebody else had [got the car stuck,] like he was upset that the car was stuck," but Haines did not say who had driven the vehicle. Id. at 94. Moore used his green Chevrolet Trailblazer ("Trailblazer") to take Haines to the Camaro, which was stuck beside a barn on Herring's property. Moore attempted to remove the Camaro with his Trailblazer but, in the process, got it stuck also. Moore then called for a ride, and the two of them rode to Berne, where they both lived.

3

On the morning of March 18, Herring went to the same window where she had seen the car approach her property and saw Moore's Trailblazer protruding from the north side of her barn. Herring called the Sheriff's Department. Id. at 37. Deputy Randy Steele of the Wells County Sheriff's Department responded to Herring's call. When he arrived, he found the Trailblazer and the Camaro stuck behind the barn. From the tracks left by the vehicles in Herring's yard, the Trailblazer appeared to have arrived subsequent to the Camaro, and the Trailblazer was positioned in such a way that looked as if it had attempted to pull the Camaro from the soft ground.

Only the Trailblazer was visible from Herring's window, and she did not know that the Camaro was also behind her barn until Steele told her so. But, when Herring went outside to look at the Camaro, she recognized it as the same vehicle that she had seen the night before. She advised Steele that, the night before, she saw a police car go past her home shortly after "the Camaro had pulled into her driveway." Tr. at 47. Deputy Steele then ran the incident reports from March 17, discovered a report from Deputy Mounsey regarding a vehicle that had failed to yield to him, and called Mounsey to inform him that he believed he had found the vehicle that Mounsey had pursued.

After receiving Steele's call, Mounsey came to Herring's home, and, when he arrived, he recognized the Camaro's taillights. The two deputies had a wrecker service tow the two vehicles away from Herring's property. The next day, pursuant to departmental policy, Mounsey conducted an inventory search of the Camaro and the Trailblazer. Although the department does not always collect items for evidence during inventory searches, Mounsey did so here in an attempt to determine the unknown identity

4

of the Camaro's driver.[1]  Among other things, Mounsey inventoried (1) a wallet, found inside the Camaro's driver's-side door compartment, that contained cards, identification, and tax refund checks belonging to Haines; (2) a Hertz rental-car agreement above the visor; (3) $2,232 in cash, found in the center console; and (4) $1,012, found in a plastic bag located under the Camaro's front seat.  Mounsey recorded all of the items onto an inventory list, and the trial court later admitted the items into evidence without objection.

The Wells Superior Court issued a warrant for Haines' arrest, which Berne Police Officer Jason Oswalt served at Haines' home on March 28.  While inside Haines' home to serve the warrant, Oswalt observed a Chevrolet key fob, which was located inside of a jar of change.  Oswalt found the key fob significant because Mounsey previously had informed Oswalt that he could not find the fob for the Camaro.  Consequently, Oswalt took the key fob into evidence and provided it to Mounsey, who, in turn, used it at the impound lot to open and start the Camaro.  The trial court later admitted the key fob into evidence without objection.

The State charged Haines with resisting law enforcement, as a Class D felony; reckless driving, as a Class B misdemeanor; and criminal mischief, as a Class B misdemeanor.  The State tried Haines by jury on June 10 and 11, 2014, after which he was convicted as charged.  After a sentencing hearing, the trial court sentenced Haines to an aggregate, executed sentence of three years.  This appeal ensued.

---

[1]  Initially, Mounsey collected only items believed to evince ownership of the Camaro. Subsequently, however, it was determined that Haines had rented the Camaro from a rental company, and it needed to be returned to the rental company.  As a result, the department collected the remaining items in the vehicle.

## DISCUSSION AND DECISION

Haines contends that the trial court erred when it admitted certain evidence, but he concedes that he failed to object at trial to the admission of this evidence, which is a prerequisite to preserving the issue for appellate review. Thus, to avoid waiver, Haines argues under the fundamental error doctrine. As we explained in Leslie v. State, 978 N.E.2d 486, 491 (Ind. Ct. App. 2012) (citations and quotation marks omitted), trans. denied:

> The fundamental error doctrine is extremely narrow. To qualify as fundamental error, an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. Further, the error must constitute a blatant violation of basic principles[;] the harm, or potential for harm[,] must be substantial[;] and the resulting error must deny the defendant fundamental due process.

Specifically, Haines argues that the trial court should have admitted neither the evidence seized from the Camaro nor the key fob because those items were collected pursuit to unconstitutional searches in violation of the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.[2] Haines further asserts that the trial court also should not have admitted the money found in the Camaro because it was irrelevant and prejudicial. We address each argument in turn.

### Inventory Search

Haines contends that the inventory search of the Camaro by Deputy Mounsey was an invalid, pretextual search for criminal evidence. Further, Haines asserts that "the State did not link the act of rummaging through the contents of the wallet to any need for

---

[2] Because Haines provides no separate authority or argument that the search violated the Indiana Constitution, his Article 1, Section 11 claims are deemed waived. Fair v. State, 627 N.E.2d 427, 430 n.1 (Ind. 1993) (citing St. John v. State, 523 N.E.2d 1353 (Ind. 1988)).

inventorying [the] contents of the car." Appellant's Br. at 9. Thus, he reasons, the evidence seized from the vehicle that identified him as its driver was unconstitutionally obtained. He argues, therefore, that it was fundamental error to admit this evidence and its fruits because, without it, no evidence existed that tied him to the Camaro. We disagree and hold that, under a fundamental error analysis, the search of the Camaro was performed pursuant to a valid inventory search.

As our supreme court explained in Taylor v. State, 842 N.E.2d 327, 330-31 (Ind. 2006) (citations omitted):

> The Fourth Amendment protects persons from unreasonable search and seizure and this protection has been extended to the states through the Fourteenth Amendment. The fundamental purpose of the Fourth Amendment to the United States Constitution is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings. For a search to be reasonable under the Fourth Amendment, a warrant is required unless an exception to the warrant requirement applies. The State bears the burden of proving that a warrantless search falls within an exception to the warrant requirement.

> A valid inventory search is a well-recognized exception to the warrant requirement. The underlying rationale for the inventory exception is three-fold: (1) protection of private property in police custody; (2) protection of police against claims of lost or stolen property; and (3) protection of police from possible danger.

Further:

> As in all Fourth Amendment jurisprudence, the test of constitutionality in inventory cases is reasonableness. . . . In determining the reasonableness of an inventory search, courts must examine all the facts and circumstances of a case. This examination typically encompasses two overlapping sets of circumstances. First, the propriety of the impoundment must be established because the need for the inventory arises from the impoundment. Second, the scope of the inventory must be evaluated. Where either is clearly unreasonable, the search will not be upheld. In borderline cases, however, the ultimate character of the search is often most clearly revealed when

7

both the necessitousness of the impoundment and the scrupulousness of the inventorying are viewed together.

Fair v. State, 627 N.E.2d 427, 431 (Ind. 1993) (citations omitted).

Haines does not dispute the reasonableness of the impoundment; he only disputes the scope of the inventory search. In Fair, our supreme court stated:

> [T]o pass constitutional muster, the search itself must be conducted pursuant to standard police procedures. The rule that standardized criteria or established routine must exist as a precondition to a valid inventory search is designed to ensure that the inventory is not a pretext for a general rummaging in order to discover incriminating evidence. In order to perform this function, the procedures must be rationally designed to meet the objectives that justify the search in the first place and must sufficiently limit the discretion of the officer in the field. Searches in conformity with such regulations are reasonable under the Fourth Amendment. Thus, to defeat a charge of pretext[,] the State must establish the existence of sufficient regulations and that the search at issue was conducted in conformity with them.

Id., 627 N.E.2d at 435. In analyzing the validity of an inventory search, the court in Fair looked at (1) whether the search was conducted at the impound lot or at the scene of the crime, (2) whether the officer who conducted the search was responsible for criminal investigations or impounded property, (3) whether formal inventory sheets were completed, and (4) whether the officer made note of the defendant's personal affects or focused only on contraband. See id., at 436.

Here, Officer Mounsey testified that it was departmental policy to conduct inventory searches of every impounded vehicle. He further testified that, while the department does not always collect inventoried property as evidence, it collected some of the property taken from the Camaro because that property provided evidence both of the Camaro's ownership and of its driver's identity. Further evidence regarding the

8

department's procedures was not adduced at trial, but Haines neither objected nor moved to suppress the evidence based on inadequate procedures or a failure to comply with otherwise valid procedures.

Considering all of the facts and circumstances provided by the record, which Haines could have developed further with an objection, we cannot say that the department's procedures or Deputy Mounsey's inventory search was so unreasonable that Haines was denied a fair trial. Although it appears that Mounsey was responsible for the criminal investigation of Haines, he conducted the search of the Camaro at the impound lot, completed a formal inventory sheet, and made note of all of Haines' personal affects, both inside and outside of Haines' wallet. See Fair, 627 N.E.2d at 436. Thus, it was not fundamental error to admit the inventoried property from the Camaro, including that property found within Haines' wallet, at Haines trial.

**Plain View**

Haines contends that the seizure of the key fob violated his Fourth Amendment rights because the State's proffered exception to the Fourth Amendment, the plain view doctrine, does not apply. The plain view doctrine is a well-established exception to the Fourth Amendment's warrant requirement. Tuggle v. State, 9 N.E.3d 726, 733 (Ind. Ct. App. 2014), trans. denied.

> The plain view doctrine justifies a warrantless seizure when 1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; 2) the incriminating character of the evidence is immediately apparent; and 3) the officer has a lawful right of access to the object itself.

Id. at 734.

Haines argues only that the plain view doctrine does not apply because the criminality of the key fob was not immediately apparent.[3]  As we have previously explained:

> The immediately apparent prong of the plain view doctrine requires that law enforcement officials have probable cause to believe the evidence will prove useful in solving a crime.  This does not mean that the officer must know that the item is evidence of criminal behavior.  Probable cause requires only that the information available to the officer would lead a person of reasonable caution to believe the items could be useful as evidence of a crime.  A practical, nontechnical probability that incriminating evidence is involved is all that is required.  A lawful seizure must be based upon a nexus between the item seized and particular criminal behavior.  The nexus must be one known to the officers at the time of the seizure and may not be based upon mere speculation.

State v. Figgures, 839 N.E.2d 772, 779 (Ind. Ct. App. 2005) (citations and quotation marks omitted), trans. denied.

The seizure of the key fob satisfies this test.  Deputy Mounsey had informed Officer Oswalt, who served the arrest warrant, that he had not found the key fob for the Camaro, and the Camaro had several items inside of it that implicated Haines as the speeding driver.  Thus, a nexus existed between the key fob and the particular criminal behavior—resisting law enforcement, reckless driving, and criminal mischief—and Oswalt had probable cause to believe that the key fob would prove useful in solving a crime.  In other words, the information available to Oswalt would lead a person of reasonable caution to believe that the key fob could be useful as evidence of a crime.  The

---

[3] Haines does not present an argument under the first or third prongs of the plain view doctrine. However, we note that Officer Oswalt's presence in Haines' home did not violate the Fourth Amendment. "An arrest warrant founded on probable cause gives the police 'limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'" Duran v. State, 930 N.E.2d 10, 15 (Ind. 2010) (quoting Payton v. New York, 445 U.S. 573, 603 (1980)).  Further, the object itself was in plain view of where Oswalt served the arrest warrant, and, therefore, Oswalt also had a lawful right to access the object itself.

trial court, therefore, did not commit fundamental error when it admitted evidence regarding the key fob at Haines' trial.

## Money

Haines additionally argues that the admission of evidence regarding the money found inside of the Camaro was fundamental error because, Fourth Amendment concerns aside, the money was irrelevant to the crimes charged and "highly prejudicial" because "[c]ash in large quantities is often associated with drug dealers." Appellant's Br. at 13. The State responds that the money was relevant because it "made it more likely that [the Camaro] was the same vehicle Deputy Mounsey had been chasing the night before. An individual would not leave over $3000 in cash in his vehicle unless he was in a hurry to exit the vehicle." Appellee's Br. at 18.

Even if we assume that the money was irrelevant to Haines' crimes and, therefore, should not have been admitted at his trial, Haines was not denied fundamental due process. In short, the evidence against Haines was overwhelming. As a result, we cannot state that the trial court committed fundamental error when it admitted evidence of the money.

Affirmed.

MATHIAS, J., and BRADFORD, J., concur.

11